**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BRIGHTVIEW LANDSCAPES, LLC<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL RADDER and COMPLETE INDUSTRIES, INC. d/b/a COMPLETE LANDSCAPING SERVICES<br><br>Defendants. | : | Civ. No. 25-3661 |

**VERIFIED COMPLAINT**

Plaintiff BrightView Landscapes, LLC ("BrightView"), by and through its undersigned counsel, files this Verified Complaint against Defendants Michael Radder ("Radder") and Complete Industries, Inc. d/b/a Complete Landscaping Services ("CLS," and with Radder, "Defendants"), and alleges as follows:

## I. Introduction

1. BrightView is one of the nation's leading commercial landscape companies. It provides a wide array of landscaping and maintenance services, including, but not limited to, landscaping design; landscaping maintenance; snow and ice removal; water and irrigation services; and tree care. Its customers include corporate campuses, sports stadiums, museums, universities, casinos, amusement parks, public parks, private homeowner associations, and many other public and private businesses.

2. Radder was a Business Developer who worked for BrightView's Maryland territory (the "Restricted Territory"). In his customer-facing role, Radder's responsibilities included direct communication with prospective clients and the development of leads and new business for

BrightView. As part of Radder's role, he was tasked with becoming familiar with BrightView's customers to expand the services provided to those customers and new customers.

3. Radder's role within the company made him privy to wide range of confidential information that BrightView uses to succeed in the highly competitive commercial landscaping industry.

4. The confidential information that Radder knows includes the identities of the precise individuals at BrightView's customers who make purchasing and contracting decisions; the annual spend of its customers; service issues, if any, that such customers may be encountering with other landscaping companies; BrightView's labor costs; BrightView's material costs; BrightView's pricing; and BrightView's target profit margins.

5. Radder was hired by BrightView on or about March 4, 2024 as a Business Developer. At hire, Radder signed BrightView's Confidentiality, Noncompetition, and Nonsolicitation Agreement, effective as of March 4, 2024 (the "Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit A.

6. Radder's Agreement with BrightView contains several restrictive covenants to protect BrightView's legitimate interests. Among them, the Agreement provides that, for one year following the termination of his employment with BrightView, Radder may not be employed by or participate in any manner with a "Competing Business" in his "Restricted Territory" where doing so will require Radder "to provide the same or substantially similar services." *See* Agreement at § 5.

7. Radder's Agreement also restricted Radder from soliciting BrightView's Customers for which Radder had "Material Business Contact" in the preceding two years for a period of one year following the termination of his employment. *Id.* at § 6.

8. On May 12, 2025, Radder's employment with BrightView was terminated for cause.

9. BrightView has learned that Radder has accepted employment with CLS in the role of Business Developer, which requires Radder to perform the same or substantially similar services to CLS as he did for BrightView.

10. CLS operates in Radder's former BrightView territory in Maryland.

11. Despite demand, neither Radder nor CLS have produced any documentation to BrightView that Radder is not servicing his territory within Maryland on behalf of CLS.

12. Despite demand for compliance with the restrictive covenants set forth in the Agreement, Radder appears to continue to breach the Agreement and CLS continues to tortiously interfere with the Agreement.

13. Radder's breach of contract, and CLS's tortious interference with BrightView's contract, threatens BrightView with irreparable injuries relating to the loss of its goodwill and the misuse and disclosure of BrightView's confidential information.

14. BrightView therefore brings this action to enforce its rights and to protect its goodwill and confidential information.

## II. The Parties

15. BrightView is a limited liability company organized under the laws of the State of Delaware. BrightView's principal place of business is located at 980 Jolly Road, Blue Bell, Pennsylvania 19422. BrightView's member is BrightView Holdings, Inc., a Delaware corporation.

16. Radder is an individual residing in Pasadena, Maryland.

17. CLS is a corporation organized under the laws of the State of Maryland.

## III. <u>Jurisdiction and Venue</u>

18. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this is a civil action between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

19. The Agreement provides that "[t]he parties agree that any and all actions or proceedings by BrightView to enforce this Agreement may be brought in the State and/or Federal Courts located in or serving Blue Bell, Pennsylvania." *See* Agreement at § 12.

20. Venue is proper in this district pursuant to 28 U.S.C § 1391(b)(2) because it is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred—namely that the Agreement was negotiated and accepted in the Eastern District of Pennsylvania and the harm was felt in the Eastern District—and because the Radder is subject to the Court's personal jurisdiction pursuant to the Agreement.

21. The Agreement also provides that "[e]ach party waives any right it may have to assert the doctrine of forum non conveniens . . . or to object to venue" and "stipulates that the State and Federal courts located in or serving Blue Bell, Pennsylvania shall have in personam jurisdiction and venue over each of them for the purpose of litigating any dispute, controversy, or proceeding arising out of or related to this Agreement." *See* Agreement at § 12.

## III. <u>Factual Background</u>

### A. BrightView's Business.

22. BrightView is a landscaping business that traces its roots back to 1939. Today, BrightView provides a range of landscaping and maintenance services throughout the United States.

23. BrightView helps its customers design landscapes that are both beautiful and functional. Once designed, BrightView develops and implements the projects to turn the designs into reality.

24. BrightView also maintains its customers' landscapes, and its maintenance services are extensive. They include fertilization, lawn care, tree care, weed and pest management, storm preparedness, water and irrigation management, and snow and ice removal services.

25. BrightView serves many different markets. Its customers include corporate campuses, sports stadiums, retail shopping centers, places of worship, museums, universities, casinos, amusement parks, public parks, private homeowner associations, and many other public and private businesses.

26. In short, BrightView is a national business providing extensive landscaping and maintenance services to customers engaged in a diverse array of businesses.

**B. Radder's Employment with BrightView.**

27. Radder began his career with BrightView in March 2024, when he was hired as a Business Developer.

28. As a Business Developer, Radder was the "face" of BrightView in its efforts to develop new business prospects and expand existing business.

29. In the role of Business Developer, Radder was responsible for developing new business on behalf of BrightView through the prospecting of new and existing landscaping customers.

30. The BrightView confidential information that Radder knows includes the identities of the precise individuals at BrightView's customers who make purchasing and contracting decisions; the annual spend of its customers; service issues, if any, that such customers may be

encountering with other landscaping companies; BrightView's labor costs; BrightView's material costs; BrightView's pricing; and BrightView's target profit margins.

31. To help him do his job as a Business Developer, BrightView gave Radder extensive training—both formal and on-the-job—to become an effective Business Developer, including training courses on developing proposals, handling objections, and disqualifying prospects.

32. Radder was also intimately familiar with BrightView's proprietary method of estimating costs and setting pricing for customer projects or maintenance contracts, and he knew BrightView's target profit margins for customer bids.

**C. Radder's Agreement with BrightView.**

33. Given the extensive goodwill with customers of and customer prospects for BrightView, with which Radder was entrusted in connection with his roles as Business Developer—along with the tremendous amount and significant sensitivity of confidential and proprietary business information that was shared with Radder and to which he was given access—BrightView required him to execute the Agreement in connection with his acceptance of employment.

34. In Section 3 of the Agreement, Radder agreed that he would not use or disclose BrightView's "Confidential Information" except on behalf of BrightView and in furtherance of its business:

> **Non-Disclosure and Non-Use of Confidential Information and Trade Secrets**. During the term of team member's employment and following the voluntary or involuntary termination of team member's employment for any reason and with or without cause, team member will not, except as authorized and required to perform team member's duties for BrightView, directly or Indirectly: use, disclose, reproduce, distribute, or otherwise disseminate BrightView's Confidential Information or Trade Secrets, or take any action causing or failing to prevent any such information to lose its character or cease to qualify as Confidential Information or a Trade Secret. Team member agrees to ask BrightView if team member has any questions about whether particular information is Confidential Information or a Trade Secret before using or disclosing such information. This prohibition

> applies regardless of whether the Confidential Information or Trade Secret was acquired before the effective date of this Agreement or thereafter.

*See* Agreement at § 3.

35. The Agreement defines the term "Confidential Information" in pertinent part as follows:

> "**Confidential Information**" means (i) competitively sensitive information, (ii) of importance to BrightView, and (iii) that becomes known to team member through his or her employment with BrightView. Confidential Information includes Trade Secrets, but an item of Confidential Information need not rise to the level of Trade Secret in order to be protected from disclosure by this Agreement. Confidential Information includes, but is not limited to, information about: BrightView's operations, services, and research and development of BrightView's operations or services; names and other listings of current or prospective Customers, proposals to any current or prospective Customers, the terms of any arrangements or agreements with any Customers, including payment and pricing information, and the implementation of Customer-specific projects; the composition or description of future services that will or may be offered by BrightView; marketing strategies; financial and sales information; and technical expertise and know-how developed by BrightView, including the unique manner in which BrightView conducts its business. Confidential Information also includes information disclosed to BrightView by any third party (including, but not limited to, current or prospective Customers) that BrightView is required to treat as confidential . . . .

*See* Agreement at § 1(c).

36. In Section 5 of the Agreement, Radder agreed that he would not compete with BrightView for one year in a limited geography upon the termination of his employment with BrightView:

> **<u>Non-Competition</u>.** Team member agrees that during team member's employment and for a period of one (1) year following the voluntary or involuntary termination of team member's employment for any reason and with or without cause, team member will not, directly or Indirectly, own, manage, operate, join, control, be employed by or with, or participate in any manner with a Competing Business anywhere in the Restricted Territory where doing so will require team member to provide the same or substantially similar services to a Competing Business as those that team member provided to BrightView during the Look Back Period of such other services that would result in the use or disclosure of Confidential Information. The foregoing is also limited to providing services in the area(s) of BrightView's Business as to which team member had material business related involvement or received Confidential Information during the Look Back Period. This provision is also not intended to prohibit: (i) employment with a non-competitive independently operated subsidiary, division, or unit of a family of companies that include

> a Competing Business so long as the employing independently operated business unit is truly independent and team member's services to it do not otherwise violate this Agreement; (ii) a passive and non-controlling ownership of less than 2% of the stock in a publicly traded company.

*See* Agreement at § 5.

37. The Agreement defines a "Competing Business" as "any individual (including team member), corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, that is directly engaged in whole or in relevant part in any business or enterprise that is the same as, or substantially the same as, any part of the Business of BrightView, or that is taking material steps to engage in such Business." *See* Agreement at § 1(b).

38. The "Business" or "line of business" is defined as "providing landscape and snow and ice services to Customers throughout the United States and abroad, including landscape and sports turf design, construction, maintenance, and enhancement, tree care, water management and irrigation, and snow and ice removal and management." *Id.* at § 1(a).

39. The Agreement defines the "Restricted Territory" as "the geographic territory in which team member worked, represented BrightView, or had Material Business Contact with BrightView's Customers in the Look Back Period." The geographic territory Radder serviced was Anne Arundel and Howard Counties Maryland. *Id.* § 1(g).

40. "Material Business Contact" means "contact that is intended to establish or strengthen a business or professional relationship for BrightView, regardless of whether the contact is with a Customer directly assigned to team member or a Customer with which team member otherwise has contact in furtherance of the team member's job duties." *See* Agreement at § 1(f).

41. The "Look Back Period" is defined as the two "year period preceding the voluntary or involuntary termination of a team member's employment with BrightView for any reason and

with or without cause (or such shorter period of time as team member is employed)." *See* Agreement at § 1(d).

42. In Section 6 of the Agreement, Radder promised that he would not solicit BrightView's "Customers":

> **Non-Solicitation of Customers.** Team member agrees that during team member's employment and for a period of two (2) years following the voluntary or involuntary termination of team member's employment for any reason and with or without cause, team member will not, either on behalf of team member or for any Competing Business, directly or Indirectly solicit, divert, or appropriate, or attempt to solicit, divert, or appropriate any Customer or accept any business from any Customer with whom team member had Material Business Contact in the Look Back Period, for the purposes of providing services that are the same as or substantially similar to those provided in the Business of BrightView.

*See* Agreement at § 6.

43. The Agreement defines "Customer" as "those individuals, companies, or other entities for whom BrightView has provided or does provide products or services in connection with the Business of BrightView or to whom BrightView has provided written proposals concerning the Business of BrightView and as to which team member has had Material Business Contact or received Confidential Information in the two (2) year period preceding the voluntary or involuntary termination of team member's employment with BrightView for any reason and with or without cause." *See* Agreement at § 1(d).

44. In the Agreement, Radder agreed that his restrictive covenants were reasonably designed to protect BrightView's legitimate interests in protecting its goodwill and Confidential Information, and further, that any breach of the restrictive covenants would cause BrightView serious and irreparable injuries for which injunctive relief is the appropriate remedy:

> **Relief, Remedies, and Enforcement.** The parties acknowledge that BrightView is engaged in a highly competitive business and the

> covenants and restrictions contained in this Agreement, including the geographic and temporal restrictions, are reasonably designed to protect BrightView's legitimate business interests, including Company goodwill and Customer and other business relationships, Confidential Information and Trade Secrets, and the specialized skills and knowledge gained by team member and BrightView's other team members during their employment. Team member acknowledges and agrees that a breach of any provision of this Agreement by the team member will cause serious and irreparable injury to BrightView that will be difficult to quantify and which may not be adequately compensated by monetary damages alone. Thus, in the event of a breach or threatened or intended breach of this Agreement by team member, BrightView shall be entitled to injunctive relief, both temporary and final, enjoining and restraining such breach or threatened or intended breach, despite any agreement between two parties to arbitrate any disputes related to any aspect of team member's employment. Team member further agrees that nothing in this Agreement, or in any agreement between the parties to arbitrate any other aspect of team member's employment, shall be construed to prohibit BrightView from pursuing any and all other legal or equitable remedies available to it for breach of any of the provisions of this Agreement, including the disgorgement of any profits, commissions, or fees realized by team member, any subsequent employers, any business owned or operated by team member, or any of team member's agents, heirs, or assigns, as well as all costs and attorneys' fees incurred because of team member's breach of any provisions of this Agreement . . . .

*See* Agreement at § 13.

45. In the Agreement, Radder also agreed that Radder's "knowledge, skills, and abilities he . . . possesse[d] at the time of commencement of employment are sufficient to permit team member to earn a livelihood satisfactory to team member without violating any provisions of Section 3 through 8 of the Agreement." *See id.*

**D. Radder's Breaches of Duties to BrightView.**

46. On May 12, 2025, Radder's employment was terminated for cause.

47. After Radder's termination, BrightView learned that Radder had accepted employment with CLS as a Business Developer, which requires Radder to provide the same or substantially the same services on behalf of CLS that he performed on behalf of BrightView.

48. CLS operates in the Restricted Territory within Maryland.

49. Despite demand from BrightView, neither Radder nor CLS has provided BrightView documentation reflecting Radder's territory and job responsibilities.

50. BrightView believes and therefore avers that Radder has solicited BrightView's Customers and has violated the non-competition agreement by being employed by a Competing Business within the Restricted Territory.

51. Given Radder's acceptance of employment with a Competing Business operating in the Restricted Territory, counsel for BrightView sent Radder correspondence reminding him of his contractual obligations to BrightView. A true and correct copy of the letter from Jonathan S. Krause to Radder dated June 4, 2025 is attached hereto as Exhibit B.

52. Radder responded to the demand letter by claiming that he was not working in the Restricted Territory, but refused to provide documentation reflecting the territory for which he serviced on behalf of CLS. BrightView asked Radder multiple times for documentation regarding his position and duties for CLS, but Radder never responded to these email requests.

53. Counsel for BrightView also sent correspondence to CLS regarding Radder's contractual obligations to BrightView. A true and correct copy of the letter from Gregory R. Sellers to CLS dated July 9, 2025 is attached hereto as Exhibit C. That letter demanded that CLS describe Radder's job duties and territory, among other things.

54. CLS did not respond to the July 9, 2025 correspondence.

55. Instead, Radder has continued to work on behalf of CLS—a Competing Business—

in, upon information and belief, the Restricted Territory. BrightView believes, and therefore avers, that Radder is also soliciting Customers (as defined in the Agreement) on behalf of CLS.

56. BrightView believes, and therefore avers, that Radder is also soliciting Customers (as defined in the Agreement) on behalf of CLS.

57. Radder has breached the Agreement by, among other things, being employed by a Competing Business, upon information and belief, within the Restricted Territory in a manner that requires him to provide the same or substantially similar services that he provided to BrightView and that will result in the use or disclosure of BrightView's Confidential Information and by soliciting BrightView Customers (as defined in the Agreement) on behalf of CLS. *See* Exhibit A, §§ 3, 5, 6.

58. Unless enjoined, Radder will continue to breach obligations owed to BrightView under the terms of the Agreement.

59. Unless enjoined, CLS will continue to tortiously interfere with BrightView's Agreement with Radder.

60. BrightView needs the protections set forth in the Agreement for it to replace Radder and introduce that replacement to BrightView's prospects and customers without improper solicitation and interference by Radder; to allow the good will Radder earned on behalf of BrightView to be transferred to new BrightView personnel; and to all Radder's memory and knowledge of BrightView's and BrightView's customer's Confidential Information to fade.

61. Absent injunctive relief, BrightView will suffer further irreparable harm through Radder's flouting of the Agreement.

62. BrightView has sustained, and will continue to sustain, serious and substantial injuries for which there is no adequate remedy at law.

63. The damages incurred by BrightView through Radder's above-described conduct, including the solicitation and servicing of the Weiner Residence, are in excess of $75,000.00.

**Count I**
**BrightView v. Radder**
**Breach of Contract**

64. BrightView incorporates by reference the preceding allegations as if fully set forth herein.

65. BrightView and Radder are parties to the Agreement, the Agreement is supported by consideration, and the restrictive covenants set forth therein are ancillary to the Agreement.

66. Radder's employment was terminated by BrightView on May 12, 2025 for cause.

67. Radder is employed by a Competing Business in, upon information and belief, the Restricted Territory.

68. Radder is providing the same or substantially similar services that he provided to BrightView to CLS.

69. Upon information and belief, the services that Radder is providing are resulting, or will result in, the use or disclosure of BrightView's Confidential Information.

70. Upon information and belief, Radder has directly or Indirectly (as defined by the Agreement) (a) solicited, diverted, or appropriated, (b) attempted to solicit, divert, or appropriate, or (c) threatens to solicit, divert, or appropriate one or more Customers with whom Radder had Material Business Contact during the last two years of his employment with BrightView.

71. Radder is continuing to provide services in competition with the Business of BrightView in the Restricted Territory, which includes, Anne Arundel and Howard Counties, Maryland.

72. By virtue of the foregoing actions, Radder has breached, and continues to threaten to breach, the non-competition, non-disclosure, and non-solicitation restraints that are set forth in Sections 3, 5, and 6 of the Agreement.

73. The non-competition, non-disclosure, and non-solicitation restraints that are set forth in Sections 3, 5, and 6 of the Agreement are reasonable in duration, geographic, and substantive scope.

74. The non-competition, non-disclosure, and non-solicitation restraints that are set forth in Sections 3, 5, and 6 of the Agreement are no greater than necessary to protect legitimate interests of BrightView, including, but not limited to, its interests in protecting its goodwill and its Confidential Information.

75. As a result of the foregoing breaches of the Agreement, BrightView has sustained, and will continue to sustain, damages.

76. Unless Radder is enjoined from the foregoing conduct, BrightView will be irreparably harmed by the loss of goodwill, the disclosure and use of its Confidential Information, the loss of the benefit of its investments, and present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

77. In the Agreement, Radder agreed that BrightView would be irreparably harmed by his breach or threatened breach of the Agreement and that, therefore, BrightView is entitled to injunctive relief and any other equitable relief allowed by law. *See* Agreement at § 13.

78. In the Agreement, Radder agreed that his knowledge, skills, and abilities are sufficient to permit him to earn a livelihood satisfactory to him without violating any provision set forth in Sections 3, 5, and 6 of the Agreement. *See* Agreement at § 13.

79. The balance of equities and public interest factors favor BrightView.

**Count II**
**BrightView v. CLS**
**Tortious Interference with Contractual Relationship with BrightView**

80. BrightView incorporates by reference the preceding allegations as if fully set forth herein.

81. BrightView and Radder are parties to the Agreement.

82. Upon information and belief, CLS was aware of Radder's agreement with BrightView through CLS's experience in the market and understanding of BrightView's use of restrictive covenants to protect its confidential information, trade secrets, and customer relationships. Nonetheless, through the demand letter, if CLS was not aware of the restrictive covenants upon Radder, it became aware of them after he was hired and continued to employ him in a manner that causes Radder to breach the restrictive covenants in the Agreement.

83. Upon information and belief, CLS intentionally, with malice or reckless indifference to BrightView's rights, induced Radder to breach the Agreement by promising Radder employment with CLS in direct competition with BrightView and to solicit, divert, appropriate, or accept business from BrightView's Customers.

84. CLS's conduct is outrageous and taken willfully, with malice, and/or reckless indifference to BrightView's rights such that BrightView is entitled to recover punitive damages.

85. As a direct and proximate result of the foregoing, CLS has caused or will cause damage to BrightView in an amount to be determined at hearing or trial of this matter, including, but not limited to, a loss of customers, lost profits, and additional expenses or damages including attorneys' fees and costs in pursuing this action.

86. As a direct and proximate result of the foregoing conduct, CLS has caused BrightView to suffer substantial and irreparable harm to its business and economic interests for

which monetary damages are an inadequate remedy and which warrant the imposition of preliminary and permanent injunctive relief.

**Prayer for Relief**

WHEREFORE, BrightView demands judgment in its favor against Radder, together with the following relief:

A. an order granting preliminary and permanent injunctive relief to enjoin the use or disclosure of BrightView's Confidential Information as required by Section 3 of the Agreement;

B. an order granting preliminary and permanent injunctive relief to enjoin Radder, for one year, from engaging in conduct in breach of the non-competition covenant set forth in Section 5 of the Agreement, including, but not limited to, an order prohibiting Radder from providing the same or substantially similar services for a Competing Business in the Restricted Territory as those that Radder provided for BrightView;

C. an order granting preliminary and permanent injunctive relief to enjoin Radder, for two years, from engaging in conduct in breach of the non-solicitation covenant set forth in Section 6 of the Agreement;

D. an order granting preliminary and permanent injunctive relief to enjoin CLS from employing Radder to provide the same or substantially similar services that he provided to BrightView in the Restricted Territory in violation of the Agreement;

E. an order granting preliminary and permanent injunctive relief to enjoin CLS from employing Radder to solicit Customers in violation of the non-solicitation covenant set forth in Section 6 of the Agreement;

F. an order granting preliminary and permanent injunctive relief to enjoin CLS from encouraging, assisting, or providing Radder support to violate the Agreement;

G. an award of damages for such actual losses as may be proven at trial;

H. an award of attorneys' fees, costs, and interest as permitted by law; and/or

I. such other and further relief as this Court deems just and equitable.

Dated: July 17, 2025

Respectfully Submitted:

**KLEHR HARRISON HARVEY BRANZBURG LLP**

/s/ *Gregory R. Sellers*
Jonathan S. Krause (No. 93817)
Gregory R. Sellers (No. 316273)
1835 Market Street, Suite 1400
Philadelphia PA, 19103
Phone: (215) 569-2700
jkrause@klehr.com
gsellers@klehr.com

*Attorneys for Plaintiff BrightView Landscapes, LLC*

# VERIFICATION

I, Justin Hatchett, declare as follows:

1. I am employed by BrightView Landscapes, LLC ("BrightView"). I am authorized to make this verification on behalf of BrightView.

2. I have personal knowledge and have, through my position at BrightView, obtained knowledge of the facts set forth in the foregoing Verified Complaint (the "Verified Complaint").

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Verified Complaint are true and correct, to the best of my knowledge, understanding, and belief. 28 U.S.C. § 1746.

Dated: 7/16/25

Justin N Hatchett

Justin Hatchett